# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7109 | **DATE** | 3/29/2002 |
| **CASE TITLE** | Akhtar vs. Continental Casualty Co | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]



**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION:** Defendant's motion (Doc 11-2) for judgment is granted. Cross-motions (Docs 11-1 and 8-1) for summary judgment are denied. All other pending motions are moot. We find that Akhtar is not entitled to benefits under the CNA Plan and therefore cannot recover under 29 U.S.C. § 1132(a)(1)(B). Accordingly, we enter judgment for CNA.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | APR 0 1 2002 | | 24 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| SCT | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

**DOCKETED**

APR 0 1 2002

| | |
|---|---|
| LAURA AKHTAR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   01 C 7109 |
| | ) |
| CONTINENTAL CASUALTY | ) |
| COMPANY, a CNA Company, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

Plaintiff Laura Akhtar ("Akhtar") filed a complaint on September 13, 2001, seeking an award of disability benefits under an insurance policy issued by Defendant Continental Casualty Company.

The parties have filed cross-motions for summary judgment, based on identical supporting documents. If summary judgment was not appropriate, both suggested as an alternative that this court enter findings of fact and conclusions of law pursuant to Fed. R. Civ. Proc. 52 based on the record submitted. Hess v. Hartford Life & Acc. Ins. Co., 274 F.3d 456, 461 (7th Cir. 2001); Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999). Upon reviewing the submissions of both parties, we conclude that there are disputed issues of material fact as to the extent of Akhtar's ability to perform any gainful employment during the applicable time period. Summary judgment

is therefore precluded, and the cross-motions are accordingly both denied. However, we agree that the alternative method of resolution under Rule 52 is suitable in this case. We have reviewed the record submitted and enter the following findings of fact and conclusions of law based on the information it contains.

## FINDINGS OF FACT

1. Akhtar is a 56-year-old woman. At all times relevant to this litigation, she was a resident of Plainfield, Illinois, and Rochester Hills, Michigan.

2. Continental Casualty Company ("CNA") is a CNA insurance company, with its principal place of business in Chicago, Illinois.

3. Akhtar holds a master's degree in library science. (R. 340). From 1995 to 1997, she worked as a library manager for Giffels Associates ("Giffels"). (R. 508).

4. In her capacity as library manager, Akhtar's primary duty was to maintain the library material and microfilm collection, which included filing library material, maintaining and updating library holdings, and collating and collecting microfilm to be filmed. (R. 534). Her job required her to sit for approximately 5 hours per day and to stand, walk, bend, and climb stairs for one hour each per day. (R. 508). Throughout the course of her day, Akhtar would lift and carry books and papers weighing 0-5 pounds, often overhead. (Id.).

5. Akhtar's employment benefits at Giffels included long-term disability coverage through a policy underwritten by CNA. (R. 1-22, 518-21).

6. The terms of the CNA policy contained both an "occupational" and a "general" disability provision. Hammond v. Fidelity and Guar. Life Ins. Co., 965 F.2d 428, 430 (7th Cir. 1992). The occupational standard provided that an employee who was "(1) continuously unable to perform the substantial and material duties of his regular occupation; (2) under the regular care of a licensed physician other than himself; and (3) not gainfully employed in any occupation for which he is or becomes qualified by education, training or experience" would be considered totally disabled. Such an employee would receive payments for a maximum of 24 months after the disability began. (R. 6, 16, 17).

7. At the end of the initial 24-month period, an employee's entitlement to further benefits was determined according to a "general" disability standard. Hammond, 965 F.2d at 430. Under this standard, to be totally disabled, an employee must be "(1) continuously unable to engage in any occupation for which he is or becomes qualified by education, training or experience; and (2) under the regular care of a licensed physician other than himself." (R. 16).

8. Employees who fit the respective disability definitions would be paid 70% of their salary for each month that the disability continued. (R. 4). The plan specified that benefits would be paid monthly immediately after CNA received "due written proof of loss." (R. 22). The summary plan description stated: "Continental Casualty shall have discretionary authority both to determine an emloyee's [sic] eligibility for benefits and to construe the terms of the policy." (R. 57).

9. In November 1996, Akhtar began to suffer from loss of strength in her right leg, neck pain, back pain, and incontinence. (R. 530-34).

10. In October 1997, Akhtar filed for disability benefits under the CNA plan. (R. 530-31). Her primary care physician, Dr. Tikh, submitted an accompanying statement, which said that Akhtar had degenerative joint disease, degenerative disk disease, and disease of the nerve roots (radiculopathy) but classified Akhtar as "capable of clerical/administrative (sedentary) activity." (R. 532-33).

11. In February 1998, Dr. Aloot, Akhtar's rheumatologist, performed a physical capacities evaluation and concluded that Akhtar could sit, stand, or walk for less than one hour each during the course of a work day. (R. 476). She was able to occasionally lift, carry, or push up to 10 pounds and could use her hands for simple grasping and fine manipulation. (R. 477) She could occasionally bend and reach but could not squat, crawl, or climb at all. Aloot also stated that Akhtar should be totally restricted from driving. (Id.).

12. Based in part on these evaluations, CNA concluded that Akhtar was unable to perform her duties as library manager and began to pay her benefits under the occupational disability standard. (R. 510).

13. In the ensuing two years, Akhtar saw numerous doctors and underwent various surgical, medical, and physical therapy treatments to ameliorate her symptoms. (R. 362-377).

14.  Although physical therapy was somewhat helpful, Akhtar's symptoms did not resolve, and none of her physicians could give a satisfactory explanation of their cause. (R. 364-65, 367, 445, 447).

15.  Akhtar remained on occupational disability leave for the entire 24-month period allowed under the plan.  At its close, CNA arranged for her to meet with a vocational consultant, Tony Gulledge, to assess her ability to perform occupations other than library manager for which she was qualified.  (R. 340).

16.  Gulledge concluded, based on his meeting with Akhtar and his review of her medical information, that although Akhtar was not capable of performing her duties as a library manager, she was qualified and able to hold other sedentary occupations. (Id.).

17.  In July 1999, Dr. Brennan submitted a physical capacities evaluation to CNA that stated Akhtar could sit, stand, or walk for one hour each during the course of a work day.  (R. 355).  She was able to occasionally lift or push up to 5 pounds and could use her hands for fine manipulation. (Id.)  According to Brennan, Akhtar could not bend, squat, crawl, climb, or reach at all, and she was moderately restricted in driving a car. (R. 356).

18.  Based on the medical evidence in Akhtar's file, CNA concluded that Akhtar did not fit the general disability definition and terminated her benefits as of September 12, 1999.  (R. 337-39).

19.  Akhtar disagreed with CNA's denial and submitted further information from four of her examining physicians, including a rheumatologist.  (R. 264).

20. The additional information submitted did not convince CNA that it was necessary to change their decision, and Akhtar's claim was forwarded to the internal appeals committee. (R. 264).

21. The appeals committee affirmed the earlier determination that Akhtar was not entitled to benefits. (R. 261-62). The letter informing Akhtar of the decision stated that the committee had considered reports from five of Akhtar's examining physicians in reaching its conclusion that the denial of benefits was correct. (Id.).

22. In August 2000, Akhtar's new primary care physician, Dr. Clancy, submitted a statement to Akhtar's life insurance carrier, echoing Dr. Tikh's 1997 findings that Akhtar was moderately limited in her functional capacity. Dr. Clancy's assessment again indicated that Akhtar was "capable of clerical/administrative (sedentary) activity." (R. 98, 177).

23. At some point after November 2000, Akhtar began seeing a new primary care physician, Dr. Pettigrew. (R. 163).

24. In December 2000, Akhtar's counsel requested another reconsideration of the denial of her benefits. (R. 78).

25. Before reaching a conclusion on the reconsideration, CNA retained a consultant physician to examine Akhtar's medical records to once again consider her state of disability at the time of the denial. (R. 83-87). The consultant, Dr. Truchelut, concluded that none of the medical findings "would clearly have precluded the claimant

from sedentary job activities, the current and future diagnoses notwithstanding." (R. 87). This opinion led CNA to once again deny Akhtar continued benefits. (R. 78, 134).

26. Akhtar's diagnoses have included lupus, antiphospholipid antibody syndrome, fibromyalgia, connective tissue disease, and post trauma injury syndrome. (R. 211, 221, 267, 277, 270).

27. On May 10, 2001, Akhtar's counsel sent a letter to her expressing concern over Clancy's August 2000 report to Canada Life in the context of litigation. (R. 79).

28. Two weeks later, on May 25, 2001, Pettigrew submitted a copy of Clancy's previous statement to Canada Life, requesting that Akhtar's physical impairment classification be changed to Class 5. This classification denotes severe limitation of functional capacity and incapability to perform sedentary activity. Dr. Pettigrew added, "Pt cannot have a sedentary job but needs light housework duty [sic] gardening to build strength." (R. 96).

29. Approximately one month later, Dr. Pettigrew submitted a letter to CNA containing similar conclusions as to Akhtar's ability to work. (R. 133).

30. On August 1, 2001, CNA completed yet another review of Akhtar's file in response to a complaint Akhtar filed with the Illinois Department of Insurance. This review took Dr. Pettigrew's letter into consideration and again concluded that Akhtar was not eligible for benefits under the terms of the plan when her general disability period began. (R. 119).

31. On September 13, 2001, Akhtar filed suit in this court pursuant to 29 U.S.C. § 1132(a)(1)(B).

## CONCLUSIONS OF LAW

1. Title 29 U.S.C. § 1132(a)(1)(B) provides that a participant or beneficiary may bring a civil action to recover "benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan...."

2. This court has jurisdiction over the parties to and the subject matter of this case. 29 U.S.C. §§ 1132(e)(1), 1132(f), 1331.

3. CNA's principal place of business is Chicago, making venue is proper in the Northern District of Illinois. 28 U.S.C. § 1391; 29 U.S.C. §§ 1132(e)(2).

4. In assessing disputed benefit determinations under an ERISA plan, district courts must use a de novo standard of review unless the plan language gives discretion to the plan administrator either to construe the terms of the plan or to determine entitlement to benefits. Firestone Tire and Rubber Co. v. Bruch, 109 S.Ct. 948, 956 (1989). In the Seventh Circuit, although there is no magical incantation required to grant discretion to the plan administrator, the language of the plan must be clear. Herzberger v. Standard Ins. Co., 205 F.3d 327, 332 (7th Cir. 2000). Phrases such as "satisfactory written proof of loss" are insufficient to show a grant of discretion. Id. The language of the plan is what controls; a summary plan description cannot be used to expand discretion given under plan. See, e.g., Health Cost Controls of Illinois, Inc., v.

Washington, 187 F.3d 703, 711 (7th Cir. 1999). In this case, CNA argues that the language of the plan, requiring "due written proof" of a loss, when read in conjunction with the language of the summary plan description, confer the discretion needed to justify an arbitrary and capricious standard of review. However, in light of applicable Seventh Circuit case law, we cannot read these two documents in conjunction. There is no substantive difference between the "due written proof" required by CNA's plan and the "satisfactory written proof" that was held insufficient to grant discretion in Health Cost Controls. In addition, the language of the summary plan description states that the information it contains is not a part of the policy itself. (R. 56). The language of these two documents is therefore in conflict. Because the language of the two documents conflict, the SPD cannot be considered to supply the discretion that is not found in the language of the plan. We therefore review CNA's decision de novo.

5. Under a de novo review, we look beyond whether CNA's decision was reasonable and determine whether it was correct. Postma v. Paul Revere Life Ins. Co., 223 F.3d 533, 540 (7th Cir. 2000).

6. The key issue for us to consider is not whether Akhtar is ill or if she has been accurately diagnosed. Rather, we are limited to inquiring whether she fit the definition of total disability under the terms of the plan, i.e., whether her illness prevented her from any gainful activity when the general disability period began.

7. To qualify under a general disability provision, an employee need not be completely helpless. Hammond, 965 F.2d at 431. Entitlement depends on the employee's inability

to perform "all the substantial and material acts necessary to the prosecution of some gainful business or occupation." Id.

8. In an action under § 1132(a)(1)(B), the plaintiff bears the burden of showing that he or she satisfies all the conditions enumerated in the terms of the plan. Tolle v. Carroll Touch, 23 F.3d 174, 179 (7th Cir. 1994).

9. Akhtar focuses her attention on her continued misdiagnosis and the nature of her symptoms. She insists that CNA did not adequately assess her condition and that they did not consider all of her medical information in reaching their decision.

10. Akhtar also places significant emphasis on her doctors' retrospective opinions that her "condition was present when benefits were terminated." Pl.'s Memo. in Support of Summ. Jdgmt., at 12. She claims that Woo v. Deluxe Corp., 144 F.3d 1157, 1162 (6th Cir. 1998), mandates that CNA reverse its decision in the face of such retrospective diagnoses. We disagree. Even if Woo were binding authority, its facts distinguish it from the instant case. In Woo, the physicians who examined the plaintiff at the time benefits would have been determined were not asked whether she was disabled. Id. Consequently, they made no medical findings as to the plaintiff's condition at the applicable time. Id. The retroactive diagnoses made by subsequent specialists specifically addressed the plaintiff's abilities within the relevant time period. Id. Akhtar's situation is exactly the opposite. Almost a year after Akhtar was required to demonstrate that she could not perform any occupation, Dr. Clancy, her treating physician, believed that she could still perform clerical/administrative activity. This

opinion of Akhtar's <u>own</u> treating physician was consistent with Dr. Brennan's capacity evaluation issued contemporaneously with the end of the occupational disability period. (R. 98, 355). Indeed, Dr. Clancy's opinion was noted with concern by Akhtar's counsel and viewed as a matter to be addressed prior to litigation. The retrospective diagnoses she has offered do not controvert that her level of disability as of September 1999 allowed her to perform sedentary occupations. (R. 164-69, 171-75). Finally, the plaintiff in <u>Woo</u> sought benefits under an occupational standard; her doctors concluded that she was unable to perform the material duties of her own occupation, not any occupation for which she was qualified. <u>Woo</u>, 144 F.3d at 1162.[1]

11. Akhtar argues that we should disregard Dr. Truchelut's report because his inquiry into her condition did not include a physical examination. Because of this deficiency, she argues that CNA's decision rendered after Truchelut gave his opinion is baseless. (R. 78). Contrary to Akhtar's assertions, the record shows that CNA considered reports from several of her treating physicians in addition to Dr. Truchelut's review of Akhtar's entire file in reaching their decisions that she did not satisfy the general disability standard in 1999. (R. 78, 261-62, 337-38). The only medical evidence that strongly disagrees with these conclusions comes from Dr. Pettigrew, and his findings do not refer to Akhtar's condition as of September 1999. (R. 96, 133). CNA was entitled to rely on

---

[1] Other cases Akhtar cites for this proposition are similarly inapposite in that they involve plaintiffs seeking benefits for a period of occupational disability. <u>McOsker v. Paul Revere</u>, 279 F.3d 586, 588-90 (8th Cir. 2002); <u>Gawrysh v. CNA Ins. Co.</u>, 8 F. Supp. 2d 791, 796 (N.D. Ill. 1998).

the opinions of Akhtar's previous treating physicians, the physician consultant who reviewed all of her previous records, and the conclusions of its vocational consultant; Dr. Pettigrew's assessments do not provide an adequate basis to deviate from the findings in all these sources. Hightshue v. AIG Life Ins. Co., 135 F.3d 1144, 1148 (7th Cir. 1998); Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 380 (7th Cir. 1994); cf. LaBarge v. Life Ins. Co. of North Am., 2001 WL 109527, *8-*9 (N.D. Ill. Feb. 6, 2001) (reversing a denial of benefits when all physicians examining plaintiff agree on that plaintiff is totally disabled under applicable definition, proffered evidence establishes that plaintiff cannot engage in any gainful activity, and plan administrator conducts no independent inquiry into or assessment of plaintiff's ability to work).

12. The medical records contained in Akhtar's file, submitted by her treating physicians at the time of her denial of benefits and for over a year thereafter, indicate that although Akhtar was limited in her abilities, she retained enough function to perform sedentary occupations other than library manager. Akhtar's evidence to the contrary, consisting of Dr. Pettigrew's evaluations, came almost two years after the time period in question. In addition, they do not refer to her capabilities in September 1999 but only her physical state as of mid 2001. This is insufficient to meet her burden of showing that she was totally disabled as that term was defined in the plan as of September 1999. The evidence within the record therefore indicates that CNA was correct in its determination that Akhtar did not fit the plan's definition of total disability. Because she was not

totally disabled as defined by the plan, Akhtar is not due benefits under its terms. Without this entitlement, she cannot prevail on a claim under § 1132(a)(1)(B).

## CONCLUSION

Based on the foregoing, we find that Akhtar is not entitled to benefits under the CNA plan and therefore cannot recover under 29 U.S.C. § 1132(a)(1)(B). Accordingly, we enter judgment for CNA.

Charles P. Kocoras
United States District Judge

Dated: MAR 2 9 2002 _____